J. F. MOTTIN, *Appellant*, V. THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF LEAVENWORTH,
*Appellee.*

No. 17,993.

SYLLABUS BY THE COURT.

1. BRIDGES — *Authority of Commissioners — Repairs Not Exceeding $100.* Necessary repairs upon a county bridge requiring an expenditure not exceding $100 may be made under a contract with a committee of the board of county commissioners, or any suitable person authorized by the board to make such repairs.

2. ——— *Estimates of Expenses of Repairs—Statute Complied with.* Estimates made by a deputy county surveyor who is authorized by the board to make them, or by a committee of the board having the matter in charge, or which having been made are approved by the board, are a sufficient compliance with the statutory provisions requiring that estimates for such work shall be made.

3. ——— *Failure to Keep Records—Does Not Relieve County from Liability.* The careful conduct of public business by a county board requires that a record shall be kept of the reports of its committee, surveyor or other person delegated to make repairs upon bridges, and the action of the board thereon, but an otherwise valid claim is not defeated by the absence of a record of such proceedings.

4. ——— *Approval of Repairs on Bridge—Question of Fact for Jury.* The approval of such work by the board of county commissioners may be shown as a fact although no formal motion is made, whether recorded or unrecorded.

5. ——— *County Commissioners—Implied Authority to Repair Bridges.* "It is a general rule that persons dealing with the officers of a municipal corporation must ascertain the nature and extent of their authority, but in matters which are the proper subjects of municipal action, where there is no provision of law requiring that such authority shall be given by formal action of the governing body, it may be shown by a course of conduct which induces others honestly to assume and rely upon its existence." (*Roberts v. St. Marys*, 78 Kan. 707, syl., 98 Pac. 211.)

Appeal from Leavenworth district court.  Opinion filed June 7, 1913.  Reversed.

*A. E. Dempsey,* and *F. P. Fitzwilliam,* both of Leavenworth, for the appellant.

*James B. Kelsey,* county attorney, *Lee Bond,* and *M. N. McNaughton,* both of Leavenworth, for the appellee.

The opinion of the court was delivered by

BENSON, J.:  The question to be decided arises upon a demurrer to evidence.  The plaintiff sued upon claims for repairing bridges.  The plaintiff's evidence tended to prove the following facts:  The board of county commissioners had appointed M. C. Kennedy, one of its members, a committee on roads, bridges and poor for the first commissioner district, and J. Bleakley, another member, a like committee for the third district.  These committee appointments were entered on the journal of the board.  A deputy county surveyor, who is a civil engineer of twenty-five years' experience, was directed by the board to make estimates on bridge work when repairs were contemplated, inspect the work after it was done, and report to the board.  He is referred to in the testimony of members of the board as the engineer.  In general he performed the duties just referred to.  When there was a complaint or report that repairs were needed upon a bridge, the deputy surveyor—who for brevity will be referred to as the surveyor—was directed either by the board, or the commissioner acting as a committee in the district where the bridge was located, to make an estimate of the cost.  In some cases members of the board accompanied the surveyor.  Estimates were made accordingly, and when the repairs could be made for less than $100, a contract was let. Upon proceedings of this character repairs were made by the plaintiff upon many bridges in the year 1908, for which over fifty bills were presented to the board ranging from $12 to $99 in amount.  About one-half

of the bills were presented in November, 1908, and the others about two years later. One of the bills was in the following form:

"August 27th, 1908.

*The County of Leavenworth,*

To J. F. MOTTIN, Dr.

Repair to Bridge No. 260 per estimate . . . . $99.00.
O. K.—H. A. PERKINS,
           Deputy Surveyor."

A proper verification was added, and the following estimate was attached:

"Leavenworth, Kansas, June 18, 1908.

*To the Honorable Board of County Commissioners of Leaven-*
*    worth County, Kansas.*

GENTLEMEN:

.I hand you herewith estimate of repairs on Bridge No. 260, over Mud Creek, Reno Township.

12 pcs. 2 x 12 x 14,
 8 pcs. 3 x 12 x 16,
 2 pcs. 8 x 8 x 16,
 6 piles 16 in.,
Repair to Hand Rail, . . . . . . $99.00.
          H. A. PERKINS, Dep. Co. Sur."

The other bills were in the same form, with like verification, and estimates were attached with similar specifications. These estimates were attached to the bills filed in the year 1908 by order of the board after they had been filed. Estimates upon the bills filed in 1910 were attached before filing. The plaintiff testified that all the work was done in the year 1908, and that the bills withheld until the later date were not filed earlier because the board requested him to delay presentation. All were presented within the statutory period of limitation. The estimates made by the surveyor were entered in a book kept for that purpose, kept in his office which was destroyed in a fire which burned the court house.

The usual procedure in making repairs appears from the following quotations from testimony:

(Kennedy.) "If a bridge was reported to me to be dangerous and needed repair I reported it to the board. Before doing that I would take a ride over in the neighborhood where the bridges were, and I reported them to

the board then and would be instructed to go to work and have them fixed, notifying the engineer to make an estimate under the limit. The limit was $100. We advertised for the lowest bidder.

"Q. I will ask you to state if you ever took these matters before the board as a board. A. I think on three occasions.

"Q. State what you said to the board at that time. A. I believed that the bills were due and knew they were never paid, and I asked that the bills be paid, and I made a motion twice to that effect.

"Q. Did the board as a board have knowledge of this work? A. The major portion of it did. Mr. Bleakley used to be absent on account of sickness. Mr. Short and myself discussed these matters at these meetings. We made it a rule that on amounts over $100 must be advertised and let to the lowest bidder. So our contract price was always under $99 for any work that was done that was not advertised and let to the lowest bidder. We would have the engineer go out and make an estimate. It would be impossible to tell how much grading and material was needed. Then we would instruct him to see some bridge man or see them ourselves and tell them to do the work and not to exceed that amount. If at times he did n't use all the material that was on the list there was a deduction, and the engineer had authority to allow more material up to $100, but not more. . . .

"Q. Was there any objection made that these bills were not itemized sufficiently? A. I believe on one or two occasions there was something wrong, perhaps they were not signed up properly and he would draw our attention to it and we would have them rectified. . . .

"We referred to the deputy surveyor as the engineer —we would give him instructions after the work was brought before us—we would quite often give him instructions to have this work done. The parties that were interested in the bridges notified us that the bridges needed repairing; they would come in and notify us regarding bridges being dangerous and out of repair, and we would instruct the deputy surveyor or county surveyor to go out and make an estimate of the work and report to us. I will not say that this was done in each instance. At times we would tell him to

have the work done and at other times we would instruct somebody else after looking at the estimate. One of those courses was pursued in all bridge work.   .   .   .

"Q. I will ask you to state whether or not the work that is indicated in these bills was authorized by the board in the manner above indicated? A. Yes, sir."

(Bleakley.) "I would learn of a bridge out of repair, may be it would be on a rural route. Usually when we met as a board I made known to the board what I had heard, and the matter was referred back to me, being chairman of the committee, unless there was some objection. I don't recall any time when objection was made. That course was pursued in relation to those bills in controversy. I was advised of and knew of the work represented by these claims in my district. That work was formally discussed by the board at regular meetings in my presence. The first steps that were taken were taken at a meeting. The full board was present. I suppose these specific bridges in controversy here were among the bridges discussed.   .   .   . The matter was up before us on several occasions, because I didn't know whether to go ahead or stop, but they were clamoring for bridges—some bridges had been down the year previous, which was very annoying to the farmers, and they wanted the board to repair them. There was a great necessity for work in my district for a year or two previously. I don't remember any particular instructions I gave to Mottin, but on more than one occasion I instructed the county engineer to keep track of these bridges and repair the principal ones first, and if he found a bridge with a couple of planks broken, to have these placed in the bridge and hand in the bill. We also instructed the trustee of each township that when they found a bridge with a plank or more than a plank out—a county bridge—to renew it and at the end of the month to bring in their bill to the county. That was done to save the expense of sending the engineer out every time to look after a bridge that only amounted to a few dollars. The county surveyor reported a great many times to me, and made estimates a great many times. Sometimes the chairman of the board would take the estimates when he was going to look at them himself, other times they

were placed on record.   Sometimes the engineer may have kept them until the work was done.

"The bridge situation in my district in 1908 was very bad, and the same condition existed in the first district. I think there was scarcely a time when we met as a full board but what we discussed these principal bridge matters, because they gave us more annoyance than any other matter that was brought before us.   We took the matter up informally almost every time we met.

"Q.  Did you give any directions to Mottin regarding this bridge work, or did the board in your presence? A.  No, sir; we gave them to the engineer."

(Perkins.)  "Q.  What did you do when you made these estimates; how did you make them and what did you do with them after they were made?   A.  I went to the bridge and listed the material that was necessary and what work I thought was necessary to do the work, and I made an estimate of it, and up until a year or so ago these estimates were usually, unless it was where they had advertised, the estimates I handed to the commissioner in whose district the work was done.

"Q.  In your direct examination you said these estimates attached to these bills you took from your field books?   A.  Yes, sir.   These were copied by me off the record in the field books and attached to these bills and handed to the county commissioners.

"Q.  Were the estimates called to the attention of the county commissioners?   A.  Certainly, I handed them either to the commissioners or to the county clerk.

"Q.  You first made your estimate from your field books?   A.  Yes, sir.   After that I attached them to the bills, took them to the county clerk or the county commissioners and left them there.

"Q.  I will ask you to state if there was any of this work done without previous estimate being made?   A. No, sir."

The statute provides that:

"When a bridge built by the county is out of repair, the board shall estimate the cost of repairing it, and make an appropriation therefor; and may require the township trustee of the township, or the overseer of the road district in which the bridge is located, or some other suitable person, to proceed immediately to repair

the same, as the board may direct; provided, that if the: costs of repairing the same exceed one hundred dollars,. then like preliminary steps shall be taken as in build-- ing a bridge." (Gen. Stat. 1909, § 667.)

It appears that the commissioner for the particular· district, as a committee, directed the surveyor to make· the estimate and to let the contract when the expendi-- ture would not exceed $100. The surveyor, and possi- bly the committee in some instances, contracted with the: plaintiff for the repairs referred to in the bills under· consideration. On completion of each job the surveyor examined and approved it. The committee in charge,. and in some cases other members of the board, knew of the work as it progressed and informally reported it to the board in session, which was thus kept generally in- formed. Such work, both before and after it was done, was considered at frequent meetings of the board, and no objection appears to have been made to the con- tracts, course of business, or the work done. No rec- ord, however, was kept of these matters. It appears that the board, without particular directions as to each bridge, authorized the committee and the surveyor to proceed in the manner testified to by them, and it is at least a reasonable inference that it was intended that the necessary expense so incurred should be paid. Sim- ilar bills for repairs made in previous years by au- thority of like proceedings had been allowed to the plaintiff. The repairs specified in the bills in con- troversy were made and were of the reasonable value charged therefor.

It is insisted by the defendant that the evidence is insufficient to sustain the claim that a commissioner, acting as a committee, authorized the repairs or knew that they were being made, and further, conceding in a general way that he knew the facts, it is insisted that the county is still not liable because there was no authority from the board itself acting as a tribunal. It is also contended that the surveyor had no authority

to bind the board by his contracts. It is doubtless true that such expenditure to be legal must either be authorized or ratified by the board. It is not, however, practicable for the commissioners to visit the locality of every bridge out of repair and to make specific contracts as a board. It is sufficient if such contracts are made by its authority in the first instance or ratified by the board afterwards. A failure to take prompt action might lead to disastrous results through resulting accidents. The act done pursuant to the delegation ought, however, to be reported to the board. The careful conduct of public business requires that a record shall be kept of such authorizations and reports, but the holder of an otherwise valid claim should not be defeated by the absence of a record over which he has no control. Neither is it necessary that the delegation of authority to make repairs or the approval of work done should be by a formal motion, recorded or unrecorded. Where repairs are so made and reported to the board approval is a question of fact. In this connection a like course of business pursued for a long time and the regular payment of similar bills may also be considered. However, the safeguards of the law should not be broken down, nor claims allowed against a county merely because the board has failed to express disapproval, but ratification or approval may be found from evidence which fairly proves the fact. This responsibility, as in other cases, rests upon the court or jury trying the issue.

It was held in *Roberts v. St. Marys,* 78 Kan. 707, 98 Pac. 211:

"It is a general rule that persons dealing with the officers of a municipal corporation must ascertain the nature and extent of their authority, but in matters which are the proper subjects of municipal action, where there is no provision of law requiring that such authority shall be given by formal action of the governing body, it may be shown by a course of conduct

which induces others honestly to assume and rely upon its existence." (Syl.)

This principle is applicable to the proceedings of county commissioners as well as city councilmen.

Analogous questions are considered in *Sullivan v. School District*, 39 Kan. 347, 18 Pac. 287, *Meistrell v. Ellis County*, 76 Kan. 319, 91 Pac. 65, and *Watkins v. School District*, 85 Kan. 760, 118 Pac. 1069.

These views are in harmony with those expressed in syllabus No. 2 of *The State v. Kennedy*, 82 Kan. 373, 108 Pac. 837, although the issue there was different, and the defense made here might prevail and yet no member of the board be subject to removal.

It will be observed that under the statute the board had authority to authorize any suitable person to repair the bridges where the cost did not exceed $100. This duty could be delegated to a member or to the surveyor. If they did so authorize the committees and directed that estimates should be made by the surveyor—or if in pursuance of a recognized course of business the committee gave such directions, or if the estimates, having been made by direction of the committee, were approved by the board, then the statutory provision for an estimate was sufficiently complied with.

It is argued that the cross-examination of the witnesses showed that the contracts, estimates and inspection were really not made as testified to in chief, and that the contractor had no specific knowledge of the work upon particular bridges, and that the evidence generally was insufficient to prove the claims. Other considerations are urged which appear to relate to the weight of the testimony and are not pertinent to a demurrer to evidence, where the court can only consider whether there is any competent evidence to prove essential facts. The court can not determine the weight or reconcile conflicting testimony upon a demurrer. (*Holmes v. Culver*, ante, p. 698.)

It is concluded that the demurrer was erroneously sustained. The district court should find from all the evidence whether the facts essential to a recovery within the principles herein stated are established as to these claims, or any of them, and award judgment accordingly.

The judgment is reversed with directions to over-- rule the demurrer and proceed with the cause.